**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 14 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

ALISON JENNINGS,

      Plaintiff-Appellant,

  v.

CITY OF STILLWATER, a municipal
corporation; DETECTIVE ROBERT
BUZZARD, individually and in his
official capacity as police officer for
the city of Stillwater; OFFICER LES
LITTLE, individually and in his
official capacity,

      Defendants-Appellees.

No. 03-6206

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-01-1785-L)

Mark Hammons (Tamara L.F. Gowens with him of the brief), Hammons &
Associates, Inc., Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Margaret McMorrow-Love, Oklahoma City, Oklahoma, for Defendants-Appellees.

Before **EBEL** , **KELLY** , and **McCONNELL** , Circuit Judges.

**McCONNELL,** Circuit Judge.

Plaintiff Alison Jennings claims that members of the Stillwater, Oklahoma Police Department (the "Defendants") violated her constitutional rights by failing to adequately investigate an alleged rape and by discouraging her from pursuing prosecutions of the alleged assailants. The underlying facts stem from a sexual encounter between Ms. Jennings, then an Oklahoma State University ("OSU") student, and Alvin Porter, J.B. Flowers, Evan Howell and Marcellus Rivers, four members of the OSU football team whom we will refer to, for convenience, as the "football players." The encounter took place early Sunday morning on November 21, 1999, at a party at the house of a football teammate, Tim Sydnes. Plaintiff claims that she was raped; the football players maintain that the encounter was consensual. The football players were not charged with any crime as a result of these events.

In this suit brought under 42 U.S.C. § 1983, Plaintiff claims that lead investigator, Detective Robert Buzzard, did everything in his power to derail the investigation and make certain that the football players would be shielded from public and legal scrutiny. Specifically, Plaintiff alleges that Detective Buzzard failed to collect material evidence, failed to challenge the football players' account of the events, discouraged Plaintiff from prosecuting the football players in violation of state and federal law, and finally, caused the physical evidence from the alleged rape to be destroyed, making it difficult to maintain a civil action against the football players. The district court granted summary judgment to the

defendants on all claims.  For reasons set forth below, we affirm.

## I.  Background

Because this case arises on appeal from a grant of summary judgment, we will recount the facts in the light most favorable to the party opposed to summary judgment, namely Plaintiff.  The case has not gone to trial and many of these facts are disputed.  The question before us is whether, resolving all disputed questions of material fact in favor of Plaintiff, she has stated a claim for legal relief.

Shortly after the alleged assault, Plaintiff checked herself into a hospital. Pursuant to standard procedure, the Stillwater Police Department was notified, and two officers were dispatched to the hospital.  There, a nurse assembled a "rape kit," which included samples of Plaintiff's blood and other bodily fluids. At about the same time, two other officers, Detective Buzzard and Officer Les Little, were dispatched to the Sydnes house.

Detective Buzzard was a 1994 OSU graduate.  He had received an athletic scholarship to play baseball as a student.  Detective Buzzard's second cousin, whom he sees about twice a year, is OSU's director of media relations.  [424].  At the onset of the 1998-99 football season, Detective Buzzard addressed the football team about the police department's "role within the community and the involvement with citizens." [425.] Detective Buzzard served as lead investigator in the Jennings sexual assault case.  In that capacity, he was primarily responsible

3

for deciding who would be investigated and what evidence would be collected. [461].

After his visit to the Sydnes residence, Detective Buzzard went to the football team's on-campus offices to interview each of the accused football players. He met with each player for no more than half an hour. In written statements, each of the football players admitted to having some form of sexual contact with Plaintiff, but maintained that it was consensual. [See App. 705 (Howell); 706-07 (Rivers); 709-10 (Porter); 711 (Flowers); see also 415-18 (Report of Det. Buzzard)]. After this initial round of interviews, the football players were not again questioned by police. One further fact alleged by Plaintiff, which has some basis in the record [see 517-18] but is vigorously disputed by Defendants, is that prior to being interviewed separately by Detective Buzzard, the football players met together with Detective Buzzard and their coach, from which Plaintiff infers that Detective Buzzard might have assisted the football players in formulating a unified story and strategy.

Thereafter, Detective Buzzard interviewed Plaintiff. The session was videotaped. During this interview Plaintiff indicated that she had been drunk at the time of the alleged assault, [713-14] and that she might have trouble physically identifying each of the suspects [714]. Our review of the tape and transcript reveals that on several occasions, Detective Buzzard challenged her

4

account of the events of the previous night. He stated that police had interviewed "numerous people" at the party and told Plaintiff "something is not jiving, okay, with what you're saying and what everybody else is telling me." [App. 714]. Later, at deposition, Detective Buzzard admitted that the "numerous people" who had contradicted Plaintiff's account were none other than the four football players. [App. 1011]. Detective Buzzard was also interested in whether Plaintiff had any part in leaking the story to the press, inquiring about this at both the beginning and end of the short interview. [See App. 714, 717]. Plaintiff expressed some reluctance to pursue criminal prosecutions. At the conclusion of the interview, Detective Buzzard said that he had some "paperwork to get." [717] After asking Plaintiff for a second time whether she had leaked the story to the media, Detective Buzzard placed a "waiver of prosecution" form in front of Plaintiff, which she signed. [717]. Detective Buzzard later testified that he never used a waiver of prosecution form in any of the other fifty rape investigations in which he has been involved. [993].

Plaintiff's signing of the waiver did not end the investigation. Many of the written witness statements were obtained after Plaintiff signed the waiver form. [See 392; 458] Over the course of the investigation, a team of nearly twelve officers collected over twenty written statements from potential witnesses. [1442, 1445].

5

Within twenty-four hours of her interview with Detective Buzzard, Plaintiff returned to the police station. She asked to retract the waiver of prosecution and to be re-interviewed by a female officer. The request was granted, and Plaintiff was interviewed by Officer Skye Woodward. [See App.137-97]. Officer Woodward is not a defendant, and Plaintiff apparently concedes that this interview was properly conducted. Plaintiff seemed more comfortable talking to Officer Woodward, and described the events in greater detail. Plaintiff told Officer Woodward that she had been uncomfortable discussing the case with Detective Buzzard (146) and that she did not feel Detective Buzzard gave her a fair chance to present her story because he was "more in favor of the football team and protecting the players." (147). Plaintiff further indicated she was confused about the purpose and effect of the prosecution waiver form. [147-48].

Plaintiff informed Officer Woodward that she was likely drunk at the party and could not remember all of the night's events. [142]. She insisted, however, that the sexual contact was not consensual. [145,153] Plaintiff stated that prior to the night in question, she had never spoken to any of the football players [155], and while she conceded that she might have agreed to have sex with one of the football players [167-68], she most certainly would not have agreed to have sex with all of them at the same time. [*Id.*]

6

The discussion moved toward whether Plaintiff wished to press charges against the football players. [185-96]. Plaintiff was at least partially mollified when she learned that the players had been suspended from school, "so that they got a little bit of . . . what they deserve." [187]. However, the central issue on Plaintiff's mind was the public nature of the trial and the associated media scrutiny. [*See, e.g.*, 188,191,193]. Ultimately, Plaintiff was less than certain that she wanted to prosecute.

The interview concluded as follows:

> Q: [Officer Woodward] Is that what you think? Again I do not want to put words in your mouth.
> A: [Plaintiff] Yeah. I mean, - I don't 100 percent feel like they got what they deserved, but I don't have the energy or anything to go on and do the whole legal thing.
> Q: You're sure?
> A: Yeah.
> Q: I don't want you to feel like you don't have an opportunity.
> A: Oh, I know. And I- obviously, I did because I signed that waiver thing but after I got thinking about it last night, I was like, "No, that was stupid." So I came back in. But it really has a lot to do with them getting suspended today and the media. I don't want to deal with the media. Also I don't feel like seeing them again. I don't want to deal with them again.
> *      *      *
> Q: Do you have any questions? We'll just leave it at this.
> A: So, okay, so this pretty much ends it. Like I don't want to do anything more about that. It is done. It's a done deal.
> Q: It is your case. We're going to do what you want to do.
> A Right.
> Q: It is over.

7

A:    Okay. I would much rather do that than have this huge court thing and have the media following me everywhere and calling me all the time.

[193-96].

Plaintiff maintains that the investigation into the alleged rape was deficient. In particular, she criticizes Detective Buzzard's decision not to re-interview the football players [461], despite factual inconsistencies between the various statements of the football players. For example, one player stated that none of the four could get an erection, [Howell 705] while another player admitted to having intercourse with Ms. Jennings [Flowers 711]. [see app at 389].

One further investigative omission relates to Jill Roberts. Ms. Roberts was arguably the most important witness because, other than the few minutes Plaintiff spent with the football players in the bedroom, Ms. Roberts was with Plaintiff the entire night. [*See* 140, 42-46, 148, 155-57]. Plaintiff told police that "Jill was like the key witness– because she was there, by my side, the entire night." [148] Ms. Roberts escorted Plaintiff to the hospital after the assault, [145-46] and tried to enter the bedroom while the events were taking place [148]. Later, Ms. Roberts accompanied Plaintiff to the station and told officers that she was the only one present at the incident who was not interviewed even though she felt that she had important statements to make. [798]. Although an officer gave Ms. Roberts a witness report to fill out when she took Plaintiff to the hospital, Ms.

8

Roberts testified that she was never asked any questions or interviewed by police, nor was she contacted by police for any follow-up investigation. [727] .

The officers also failed to follow up on the written statements of David Camacho. Mr. Camacho was a teammate of the football players who briefly peeked into the bedroom while the encounter was taking place. [515] In at least one portion of his written statement, Mr. Camacho expressed his opinion that the football players should be prosecuted. [517]. Further, Tim Sydnes wrote that "Camacho called . . . and told me that he thinks they all raped her." [Sydnes 776]. Despite knowledge of these statements, police did not further question Mr. Camacho. Plaintiff claims that Mr. Camacho later became unwilling to provide testimony against his teammates, and thus that the failure of the police to pursue his testimony at the time resulted in its loss. [Br. 30].

As lead investigator, Detective Buzzard was responsible for submitting a report to the District Attorney, Robert Hudson. Detective Buzzard's report was used by Mr. Hudson, along with other information, in deciding whether to prosecute the football players [1028]. The report mainly summarized the statements of Plaintiff and the football players. [414-420] While the report pointed out inconsistencies in Plaintiff's story, it did not explore the problems with the football players' account. The report also stated that "[d]uring the [interview] I asked Jennings if she was willing to testify in court. Without

hesitation she answered 'no.'" [419]. Plaintiff asserts that no portion of the interview can be fairly construed in this manner. Lastly, Detective Buzzard's report indicated "Jennings agreed [that] sexual contact with Alvin Porter and possibly J.B. Flowers was consensual." [420]. Detective Buzzard later stated that this portion of his report was drawn from Plaintiff's interview with Officer Woodward. [1029] Again, her actual statement is more ambiguous than the report suggests. Plaintiff stated:

> So what bugged me is that perhaps I might have given consen[s]ual or had consen[s]ual sex with one of them, but I would know I would never, ever say "Hey , let's all go in there and have a big party.". . .
> Q:   So if any of it was consen[s]ual, do you know who you might have agreed to have sex with?
> A:   No. I really don't.  I want to say Alvin, but I'm not like, 100 percent positive on that. . . .
>
> . . .
> Q:   Do you think that it is possible you could have agreed to be with the other guys – or any of them?
> A:   No. I know there is no way. . .

[167-68].

About one week after the incident, District Attorney Robert Hudson issued a press release announcing that he would not press charges against the football players. [1442] The press release noted that twenty-nine witnesses were interviewed and that the investigation involved nearly a dozen police officers. District Attorney Hudson based his decision on the fact that it was his "duty . . . to file only those charges that can be proven beyond a reasonable doubt in a Court

10

of law."

Mr. Hudson testified that he became involved at a very early stage of the case. (1445-46) Throughout his deposition, the district attorney stood by Detective Buzzard's investigation of the case, and repeatedly asserted that he found nothing unusual about the investigative procedures or techniques. [1448-49, 1451, 1453-54]. Mr. Hudson also stated that there had been other rape cases where waivers of prosecution had been used [1448], and that his office routinely prosecuted other OSU athletes. He specifically recalled prosecuting at least one other OSU football player for rape at or around the time of the Jennings incident. (1452).

In mid-January of 2000, about seven weeks after the events in question, Kyle Gibbs, an employee of the Stillwater Police Department, emailed District Attorney Hudson to inquire whether the police department "should continue holding the evidence [related to the Jennings case]. . . or may we release it." [204]. District Attorney Hudson replied that he could "think of no reason to hold it any longer." [id.] The rape kit was destroyed on January 22, 2000. [421].

Plaintiff contends that the investigation was deficient to the extent of violating her constitutional rights to procedural due process, access to the courts, and equal protection. Defendants' view of these facts is quite different. They note that the investigation lasted several days in which over twenty-five witnesses

11

were either interviewed or gave written statements, and that nearly a dozen officers were involved. Further, because the football players did not deny the sexual encounter, the entire case would be premised on Plaintiff's lack of consent, regarding which, they say, there was little conclusive evidence. Plaintiff also indicated that she might have difficulty physically identifying each of the alleged assailants, and decided not once, but twice, to waive prosecution. The second decision was made after police acceded to her request to revoke the first waiver and be re-interviewed by a female officer. She makes no claim that the second interview was improperly conducted.

Defendants further note that the decision not to prosecute was made by the District Attorney, not the police department. In this regard, District Attorney Hudson testified that in addition to reading the report, he had access to the entire file [1454], had seen portions of the taped interviews with both Detective Buzzard and Officer Woodward, [1449] and was aware of Plaintiff's complaints that she felt coerced into signing the waiver form. [1496] Mr. Hudson testified that he was "absolutely" confident that he had enough information to make a reasonable decision as to whether to prosecute the football defendants. [1454].

Plaintiff initially filed a single lawsuit against OSU, the football players, and the Defendants in this action. Later, the decision was made to sever the lawsuits and proceed against each group of defendants under different legal

12

theories.  Plaintiff has informed the Court that her claims against the football

players and OSU have been settled.  Pl. Br. 4.  At oral argument, the Court was

informed that Plaintiff is under contractual duty to keep the settlement amount

confidential.

## II. Analysis

The question in this case is whether the United States Constitution provides

a cause of action for victims of crime when state or local law enforcement

officials fail to perform a proper investigation.  In general, federal courts are not

entrusted with the responsibility of ensuring the effective enforcement of state

criminal laws; that role falls to state and local law enforcement authorities. It is

the duty of executive officials – not the courts – to take care that the criminal

laws are faithfully executed.  *See* U.S. Const., art. II, §3 ; *see Morrison v. Olson*,

487 U.S. 654, 690 (1988).

Plaintiff puts forward three alternative legal theories for a constitutional

cause of action against the police officers who allegedly mishandled or sabotaged

the case against her alleged assailants, and the City of Stillwater.[1]  First, she

---

[1]Plaintiff pursues this appeal against Defendants City of Stillwater, Detective Buzzard and Officer Les Little.  It is somewhat unclear which of her claims are asserted against which parties.  In her filings, Plaintiff is most critical of the conduct of Detective Buzzard, and has little to say about Officer Little's involvement.  We therefore assume that all three claims are directed against Defendant Buzzard.  To the extent that these claims are also alleged against

(continued...)

13

alleges that Detective Buzzard's failure to comply with Oklahoma statutes relating to rape investigations violated her procedural due process rights. Secondly, that the destruction of the rape kit, the failure to conduct follow-up investigations of material witnesses, and the inaccuracies and omissions contained in the police reports impaired her constitutional right of access to the courts. Lastly, Plaintiff raises an equal protection claim stating that over the course of the rape investigation Detective Buzzard discriminated against her by favoring and seeking to protect the football players. Sympathetic though we are to a young person who has undergone such an ordeal, exacerbated by the alleged dereliction of duty on the part of the police who are employed to protect her, we conclude that none of these legal theories can be sustained.

## A. Procedural Due Process

Plaintiff first asserts a violation of her procedural due process rights. She argues that Oklahoma statutes create a constitutionally-protected property interest in "not being discouraged from prosecuting" a sexual assault claim and that the

---

[1](...continued)
Defendant Little, our analysis of the issues and dismissal as to Defendant Buzzard applies equally to Defendant Little. We further note that a municipality cannot be liable for constitutional violations unless its officers committed a constitutional violation. *Trigalet v. City of Tulsa*, 239 F.3d 1150 (10th Cir. 2001). Because we find that neither of the individual defendants violated Plaintiff's constitutional rights, we do not independently consider the city's liability, and affirm the dismissal as to the City of Stillwater.

14

various actions taken by Detective Buzzard deprived her of this right without due process.

When a due process claim is premised on a deprivation of property, the court first must define the precise nature of the property threatened by the state. *See Lehr v. Robertson*, 463 U.S. 248, 256 (1983). As the Supreme Court has stated, "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) (citations omitted). Even a detailed procedural structure does not give rise to a protected liberty interest, *Hewitt v. Helms*, 459 U.S. 460, 471 (1983), and the procedural due process claim will fail unless the plaintiff can point to some substantive legal obligation underlying the procedures. *Doe by Fein v. District of Columbia*, 93 F.3d 861, 868 (D.C. Cir. 1996).[2] The property interest must be "specific and presently enforceable." *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1569 (10th Cir. 1993). As a general matter a protectable interest is not created when the state provides "'substantive predicates' to govern official decisionmaking," but only when the state "*mandat[es] the outcome to be reached*." *Id.*, *quoting Ky. Dep't of Corr. v.*

_____

[2] Although the Supreme Court has disavowed the *Olim/Hewitt* approach as it relates to prison regulations, *Sandin v. Connor*, 515 U.S. 472, 481-84 (1995), this Court has continued to apply that analytical framework to analyzing statutes defining rights and remedies available to the general public. *See Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1102 n.6 (10th Cir. 2004) (en banc).

15

*Thompson*, 490 U.S. 454, 459 (1989) (emphasis in original; internal quotation marks omitted).

Here, Plaintiff relies on the rights granted to rape victims under Oklahoma statutory law. The then-applicable statutes provided in relevant part:

> Upon the preliminary investigation of any rape or forcible sodomy, it shall be the duty of the officer who interviews the victim to . . . give notice to the victim . . . of certain rights of the victim. The notice shall consist of handing such victim . . . a written statement in substantially the following form: "As a victim of the crime of rape or forcible sodomy, you have certain rights. These rights are as follows:
>
> > 1. The right to request that charges be pressed against your assailant;"

Okla. Stat. tit. 22, § 40.1 (1999).

> A peace officer shall not discourage a victim of rape, forcible sodomy or domestic abuse from pressing charges against the assailant of the victim.

Okla. Stat. tit. 22 § 40.3(A) (1999).[3]

Relying on the panel opinion in *Gonzalez v. City of Castle Rock*, 307 F.3d 1258, 1264 (10th Cir. 2002), Plaintiff argues that when regulatory language in a statute "is so mandatory that it creates a right to rely on that language," an entitlement is created that "[cannot] be withdrawn without due process." *Id.*,

---

[3] The language of the statute was slightly modified in 2002. The current provision, codified at 22 Okla. Stat. § 40.2 (2002), reads: "No peace officer shall discourage a victim of rape or forcible sodomy from pressing charges against any assailant of the victim."

16

*quoting Cosco v. Uphoff*, 195 F.3d 1221, 1223 (10th Cir. 1999) (per curiam).

Plaintiff argues that Okla. Stat. tit. 22, § 40.3(A) entitles her not to be discouraged from prosecuting the offenders, and that Detective Buzzard deprived her of this right.

Whatever the force of this argument under our *Gonzales* holding as it existed at the time Plaintiff filed her appeal, it is foreclosed by our subsequent en banc opinion, issued just before this case was argued. *See Gonzales v. City of Castle Rock*, 366 F.3d 1093 (10th Cir. 2004) (en banc) [hereinafter *Gonzales II*]. In *Gonzales II* we analyzed due process claims brought against local police officers who failed to enforce a court-issued restraining order. Both the restraining order and the relevant state statute contained language that required police to arrest restrained persons who were in violation of the order. The statute provided: "A peace officer shall arrest, or, if arrest is impractical . . . seek a warrant for the arrest of the restrained person." *Gonzales II*, 366 F.3d at 1097, 1104. While the original panel opinion left open the possibility that the mandatory statutory language, standing alone, could create an interest enforceable through the due process clause, that position was rejected by the en banc Court. The en banc Court characterized Ms. Gonzales' property interest as the product of a court-issued restraining order, coupled with statutory language requiring enforcement. *See id.* at 1101-05. The Court disclaimed the theory Plaintiff now

17

urges:

> In this context, many of the cases cite[d in the] dissent are inapposite to the specific facts and legal arguments raised in the present case because the courts in those cases rejected the argument that statutes detailing procedures regarding general child abuse investigations and reporting could *alone* create a protected interest in such services. [citing cases] In this case, *the [state] statute alone does not create the property interest.* Rather, the court-issued restraining order, which specifically dictated that its terms must be enforced, and the state statute commanding the same, establish the basis for Ms. Gonzales' procedural due process claim.

*Id*. at 1101 n.5 (emphasis added).

Similarly, after addressing the state's statutory regime, the Court dropped a footnote stating:

> While we asked the parties to brief whether a protected property interest was created by the mandatory terms and objective predicates laid out in [the state statutes], we do not so hold. Rather, we conclude that the statute's force derives from the existence of a restraining order issued by a court on behalf of a particular person and directed at specific individuals and the police.

*Id*. at 1104 n.9.

Here, unlike *Gonzales II*, Plaintiff's asserted property interest rests solely on the language of the Oklahoma statute. There was no court order specifically applying the protections of the statute to her. The procedural due process claim can thus not be maintained.

**B. Access to the Courts**

18

Plaintiff next claims that she was unconstitutionally denied access to the courts. Her claim is premised on the City's destruction of the rape kit and on the various investigative omissions and irregularities allegedly committed by Detective Buzzard, which undermined her ability to bring a private tort action against her alleged assailants. Plaintiff alleges that Detective Buzzard's assumption of the role of lead investigator, the failure to interview Mr. Camacho and Ms. Roberts, and a host of other investigative shortcomings were all part of a plot to protect the football players. When taken in the aggregate, she insists that these actions violated her constitutional right to meaningful and effective access to the courts. [Br. 30; App. 405-07.]

This Circuit has not recognized a constitutional cause of action based on denial of access to the courts under these circumstances. In *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995), *abrogated on other grounds*, *Saucier v. Katz*, 533 U.S. 194 (2001), plaintiff Wilson claimed that members of a local police force used excessive force in shooting him and then failed to render the requisite medical care. According to the allegations, police failed to properly investigate the incident, lost evidence, altered evidence, and set up a "code of silence" amongst the officer corps, all in an attempt to cover-up the prior misdeeds. *Id*. at 1556-57. Wilson brought a constitutional claim based on the cover-up, characterized as a deprivation of the right of access to courts.

19

On appeal from the district court's denial of summary judgment for the defendants based on qualified immunity, this Court noted that while "[o]ther circuits have recognized a cause of action for [police] cover-up," the Tenth Circuit had not endorsed this cause of action *Id.* at 1557. Further, *Wilson* explained that even the Fifth Circuit, which first articulated the access-to-courts claim, had since limited these claims to cases alleging interference with the filing of the complaint. *Id., citing Foster v. City of Lake Jackson*, 28 F.3d 425, 430 (5th Cir. 1994). *Wilson* thus strongly suggests that a police cover-up does not give rise to a constitutional claim of denial of access to courts in this Circuit.

*Wilson,* however, was decided before the Supreme Court had mandated that the clearly established inquiry be disaggregated from the constitutional violation question in qualified immunity cases. *See Saucier*, 533 U.S. at 201. It is therefore possible to read *Wilson* as simply holding that, at the time, the conduct did not violate any rights that were clearly established in this Circuit. *See id.* at 1557 ("Even assuming such a duty exists, defendants are entitled to qualified immunity" and "[w]e conclude that [cases finding a cause of action] do not comprise the 'great weight of authority' necessary for a clearly established duty based on the alleged cover-up . . . .").

Even assuming that *Wilson* does not foreclose recognition of the access to courts cause of action here, the Supreme Court's recent decision in *Christopher v.*

20

*Harbury*, 536 U.S. 403 (2002), requires dismissal of Plaintiff's claim on a narrower ground. Plaintiff Harbury brought a *Bivens* action against a number of federal officials for misleading her regarding the whereabouts of her husband, a Guatemalan dissident. *Id.* at 406. According to the allegations, the husband had been detained, tortured, and executed by Guatemalan army personnel acting at the direction, and with the support, of the CIA. *Id.* at 406-07. Plaintiff claimed that the officials' deception prevented her from bringing a lawsuit against the United States, which could have saved her husband's life. *Id.* at 409-10.

Rather than addressing whether Plaintiff's allegation stated a constitutional cause of action, the Supreme Court assumed that an "access-to-the-courts" claim existed, and then proceeded to discuss the elements of this assumed claim. *Id*. at 412-22. The Court divided access-to-the courts claims into two categories. *Id.* at 413. The first, termed "forward looking claims," are cases where official action frustrates a plaintiff's ability to bring a suit at the present time. *Id.* Classic examples include suits claiming that the denial of law library privileges prevents prisoners from effectively filing claims of alleged prison abuse. *Id*. The second class, termed "backwards looking claims," arise when plaintiffs allege that a specific claim "cannot be tried (or tried with all the evidence) [because past official action] caused the loss or inadequate settlement of a meritorious case." *Id.* 413-14. In this way, the official action is said to have "'rendered hollow [the

21

plaintiff's] right to seek redress'" in the courts. *Id.* at 414, *quoting Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (brackets in original). At least some courts have conceptualized this harm as a denial of access to the courts. *See, e.g., Ryland v. Shapiro*, 708 F.2d 967, 971-73 (5th Cir. 1983); *Bell*, 746 F.2d at 1260-61.

The Supreme Court was careful not to endorse the validity of these backwards looking claims. Rather, in the course of describing various forms of access-to-courts cases decided in the lower courts, the Supreme Court dropped a footnote stating: "[s]uch cases have been decided in the Courts of Appeals; we assume without deciding the correctness of the decisions." *Harbury*, 536 U.S. at 414 n.9 (citations omitted). *Harbury* did not cite any Tenth Circuit precedents. 536 U.S. at 413 n.7 & n.8.

While *Harbury* was careful not to endorse the backwards looking claim, it held that an element of any backwards looking claim is for the complaint to "identify a remedy that may be awarded as recompense but not otherwise available in some suit that may yet be brought." 536 U.S. at 415. The Court's rationale was that there is "no point in spending time and money to establish the facts constituting denial of access when a plaintiff would end up just as well off after litigating a simpler case without the denial-of-access element." *Id.*

Under this standard Plaintiff's claim must fail. The only remedy that could

conceivably be awarded to Plaintiff as a result of the alleged police misconduct would be damages for the loss of her civil tort claim against the assailants; but this is precisely the same element of damage she sought and obtained in her suit against the four football players and OSU. Far from being barred from bringing such an action, Plaintiff pursued her claims and reached a monetary settlement with the four football players and OSU. She thus had access to the courts, and obtained a remedy. Plaintiff has not specifically alleged, or presented evidence, that the settlement amount was inadequate on account of the government's actions so as to deny her meaningful relief. At several points in her appellate briefs, she alludes to such a claim. *See, e.g.*, Pl. Br. 29. ("[T]he question is not merely whether Ms. Jennings could still maintain and prosecution and [sic] action, but also whether or not her ability to receive appropriate compensation has been compromised by the destruction of evidence having a non-speculative value to the case."); Pl. Br. 30 (none of defendant's arguments "suggests that Ms. Jennings' ability to secure adequate relief was not materially impaired by the destruction of evidence."). But her complaint contains no such allegation, and the record contains no evidence on the point. Moreover, in light of the confidentiality of Plaintiff's settlement, there is no way such a claim could be evaluated.

Thus, even assuming the legal viability of a backwards looking denial-of-access claim, Plaintiff's case fails under the standards set forth in *Harbury*. The

23

district court properly dismissed this claim.

## C. Equal Protection

Finally, Plaintiff argues that Detective Buzzard's treatment of her case violated the Equal Protection Clause. She frames her argument as follows:

> Plaintiff's evidence shows that she was singled out due to some bias on the part of the defendant. In particular, Plaintiff, out of 50 rape victims, was the only one asked to sign a waiver of prosecution. Not only is this the only case in which a waiver is sought, the lead investigator lied to secure the waiver and then lied to the District Attorney regarding Plaintiff's statements. There is no other instance in which the lead investigator lied regarding statements made by the rape victim. Of course, there is not "any legitimate state objective" justifying the waiver or these lies.

App. 408 (citations, ellipses and quotation marks omitted).

Plaintiff does not claim that the unequal treatment of her claim was due to her membership in any protected class or racial or gender group. Rather, she asserts that she suffered discrimination as a "class-of-one." In *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1148-49 (10th Cir. 2001), this Court held that "Equal Protection affords protection to an individual injured by intentional or purposeful discrimination without identification of a class." *Id.* (citation and quotation marks omitted). *Bartell* relied on the Supreme Court's decision in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), which held that plaintiffs need not allege that they were part of a suspect class to state an equal protection claim. *Bartell*, 263 F.3d at 1149, *citing Olech*, 528 U.S. at 565.

24

*Olech* involved property owners who wished to be connected to the municipal water supply. Although the municipality typically required a fifteen-foot easement for this service, it demanded thirty-three feet from the plaintiffs. Plaintiffs claimed that the demand for the additional easement was "irrational and wholly arbitrary." *Id*. at 563. In a short per curiam opinion, the Court affirmed the class-of-one theory, finding that the purpose of equal protection "is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination ." *Id*. at 564, *quoting Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (internal quotation marks omitted). The Court stated that "[t]hese allegations [of irrational and wholly arbitrary treatment], quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." *Olech*, 528 U.S. at 565.

In a two-paragraph concurrence, Justice Breyer expressed concern that *Olech* would transform ordinary violations of state or local law into constitutional cases. *See id.* at 565-66. The concurrence noted that because zoning decisions almost always treat one landowner differently than another, "one might claim that, when the city's zoning authority takes an action that fails to conform to a city zoning regulation, it lacks 'rational basis.'" *Id.* at 565. Justice Breyer concurred in the judgment because the plaintiff's claims were actionable specifically because they alleged that city officials took "vindictive action" acting with

25

"illegitimate animus" and "ill will." *Id.*, *quoting Olech v. Village of Willowbrook,* 160 F.3d 386, 388 (7th Cir. 1998*).*

In the wake of *Olech*, the lower courts have struggled to define the contours of class-of-one cases.[4] All have recognized that, unless carefully circumscribed, the concept of a class-of-one equal protection claim could effectively provide a federal cause of action for review of almost every executive and administrative decision made by state actors. It is always possible for persons aggrieved by government action to allege, and almost always possible to produce evidence, that they were treated differently from others, with regard to everything from zoning to licensing to speeding to tax evaluation. It would become the task of federal courts and juries, then, to inquire into the grounds for differential treatment and to decide whether those grounds were sufficiently reasonable to satisfy equal protection review. This would constitute the federal courts as

---

[4] Commentators have similarly noted this confusion. *See e.g.*, Robert C. Farrell, *Class, Equal Protection and* Village of Willowbrook v. Olech, 78 *Wash. L. Rev.* 367 (2003); Hortensia S. Carreira, *Protecting the "Class of One,"* 36 *Real Prop. Prob. Tr. J.* 331 (2001); J. Michael McGuinness, *The Rising Tide of Equal Protection: Willowbrook and the New Non-Arbitrariness Standard*, 11 *Geo. Mason U. Civ. Rts. L.J.* 263 (2001); J. Michael McGuinness, *The Impact of* Village of Willowbrook v. Olech *on Disparate Treatment Claims*, 17 *Touro L. Rev.* 595 (2001); Paul D. Wilson, *What Hath Olech Wrought? The Equal Protection Clause in Recent Land-Use Damages Litigation*, 33 Urb. Law. 729 (2001); Timothy Zick, *Angry White Males: The Equal Protection Clause and "Classes of One,"* 89 *Ky. L. J.* 69 (2000-2001); Erwin Chemerinsky, *Suing The Government for Arbitrary Actions*, 36 *Trial* 89 (May 2000).

26

general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.

To make matters worse, a certain degree of randomness and irrationality necessarily "abounds at the bottom rung of law enforcement," *Bell v. Duperrault*, 367 F.3d 703, 712 (7th Cir. 2004) (Posner, J., concurring), and in other areas of state and local decisionmaking, as well. A police officer may allow a car traveling 20 m.p.h. over the speed limit to fly right by, while stopping to ticket a car traveling only 15 m.p.h. above the limit. A public university may admit one applicant and deny another with seemingly identical credentials. The IRS may audit one taxpayer and not another with an identical, or more suspicious, profile. An insistence that all government officials be able to provide articulable reasonable grounds for every difference in treatment would open almost every low-level decision to attack, and play havoc with the daily operation of government.

Some courts, taking the lead of Justice Breyer, have attempted to cabin the reach of class-of-one equal protection cases by demanding that plaintiffs present evidence not merely of arbitrariness but of malice or ill-will against the plaintiff. *Discovery House, Inc. v. Consol. City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003) (adopting Justice Breyer's concurrence as the holding of *Olech*; noting that

27

the malice requirement "is a very significant burden" put in place to ensure that federal courts do not become "zoning boards of appeal"); *Harlen Assoc. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499-500 (2d. Cir. 2001) (personal animus is an element of a class-of-one case); *Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2001) (explaining *Olech* as "holding that plaintiff stated constitutional Equal Protection Clause cause of action by alleging that village acted irrationally, wholly arbitrarily, and out of malice toward plaintiff").[5] This Circuit seems to have adopted a similar approach. *Bartell* dismissed the class-of-one claim because plaintiff provided "no concrete evidence of a 'campaign of official harassment directed against him out of sheer malice.'" 263 F.3d at 1149, *quoting Esmail v. McCrane*, 53 F.3d 176, 179 (7th Cir. 1995).

Under such a standard, Plaintiff could not prevail. She does not allege that the defendants bore any particular ill will or malice against her; rather, the gravamen of her claim is that Detective Buzzard was seeking to protect the OSU football program from the adverse publicity and other consequences of the rape prosecution of four of its players. Presumably, any other person accusing OSU athletes of a heinous crime would receive similar treatment. Thus, it might be

---

[5]*But see Bell v. Duperrault*, 367 F.3d 703, 712-13 (7th Cir. 2004) (Posner, J., concurring) ("[P]ersonal ill will is not the essential criterion of a meritorious class-of-one suit. It is enough if the plaintiff can prove that the defendant is treating similarly situated people differently for improper (normally personal) reasons, whether his motive is hatred or greed.").

more accurate to say this is not a case of discrimination against a "class of one," but a case of discrimination in favor of a powerful and popular local institution. It is not clear that the precedent of *Olech* can be stretched to cover such a case.

But we do not rest our decision on that ground. The more important shortcoming in Plaintiff's equal protection case is that she has failed to identify any specific actions of the defendants that both were wholly arbitrary and lacking in legitimate justification and also had a concrete effect on her rights. The ultimate decisions not to prosecute the football players and to release the rape kit were made not by defendants Buzzard or Little, but by District Attorney Hudson, who is not a defendant. Plaintiff makes no allegation that Hudson's actions were discriminatory or wholly arbitrary. According to undisputed evidence in the record, Hudson's office routinely prosecuted other OSU athletes, including at least one other OSU football player for rape at or around the time of the Jennings incident [1452]. His decision not to prosecute in this case was made, in addition to other reasons, on the basis that Plaintiff had chosen to waive prosecution. Although her initial waiver may have been tainted by Officer Buzzard's improper behavior, Plaintiff makes no claim that her second interview, conducted by Officer Woodward, was improper, or that the second waiver was illegitimately extracted. Her decision to sign the waiver the second time was motivated primarily by her fear of the media attention and public scrutiny likely to ensue as

29

a result of the court proceedings.

Plaintiff's allegations of discrimination are directed not at the decisions by the ultimate decisionmaker, but at various actions of Officer Buzzard, including his use of the prosecution waiver form in Plaintiff's case (the only time he did so in fifty rape prosecutions) and his alleged "lies" both to Plaintiff to secure the waiver and then to the district attorney. App. 408. The problem is that these actions by Officer Buzzard, even assuming they are every bit as improper, arbitrary, and discriminatory as Plaintiff alleges, were not final decisions; they were only steps in a process leading toward a final decision. Even assuming that Detective Buzzard's administration of the waiver form and "lies" to her during interrogation had the effect of inducing her to waive prosecution, Plaintiff revoked that waiver within twenty-four hours and was reinterviewed, properly, by another officer. And in light of her second waiver, as well as District Attorney Hudson's access to the entire investigative file, there was ample basis for Hudson's decision not to prosecute, independent of Detective Buzzard's mischaracterizations of Plaintiff's testimony in his report. Indeed, Plaintiff does not contend otherwise. A plaintiff may not base an equal protection challenge to intermediate steps in a decisionmaking process, where the ultimate result was not discriminatory. That is sufficient to distinguish *Olech*, where the decision that was the subject of the litigation was a final action by the final decisionmaker.

30

In *Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275 (10th Cir. 2003), the plaintiff, Burns, was fired from his job as a county employee. He was afforded post-termination process by a county board which sustained the county's action on a 2-1 vote. In an equal protection claim brought under § 1983, Burns alleged that the board's determination to sustain the termination was biased and racially motivated, because one of the voting members had called him a "no good Indian." The Court credited the remark for summary judgment purposes, but nevertheless found that Burns failed to state an equal protection violation, because he "ha[d] not shown that the outcome of the hearing would have been different had [the allegedly racist commissioner] recused from voting." *Id.* at 1284. The county prevailed on summary judgement because the plaintiff failed to come "forward with any evidence that the outcome would have been different had [the allegedly racist commissioner] abstained from voting." *Id.* at 1285.

Similar logic applies here. Even assuming that Detective Buzzard favored the football team and discriminated against Plaintiff, he represented but one link in the chain of events. Ultimately the decision not to prosecute was made by District Attorney Hudson, and Plaintiff does not contend that Hudson's actions were discriminatory or wholly arbitrary. As in *Burns*, she presented no evidence that the ultimate decisions would have been different if Detective Buzzard had not

31

treated her in a discriminatory fashion.

There is a second defect in Plaintiff's equal protection claim: she failed to make an adequate showing that similarly situated persons were treated differently. *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 739 (1985) (the Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike"). It is this comparative element that distinguishes the Equal Protection Clause from the Due Process Clause. *See Ross v. Moffitt,* 417 U.S. 600, 609 (1974) ("'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated. 'Equal protection,'on the other hand, emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable."). This element is especially important in class-of-one cases. *See Payne v. Huntington Union Free Sch. Dist*., 219 F. Supp. 2d 273 (E.D.N.Y. 2002) (finding that no one else was similarly situated to the wife of school superintendent, since only the superintendent supervises *all other* school district employees); *McDonald's Corp. v. Norton Shores*, 102 F. Supp. 2d 431, 438 (E.D. Mich. 2000) (regarding adverse zoning decision, McDonald's was not similarly situated to other fast food restaurants on the same street).

Traditional equal protection law deals with groups unified by the characteristic alleged to be the root of the discrimination. In the classic case of

32

racial discrimination, it is appropriate to assume, at least at the outset, that disadvantageous treatment is a function of systematic discrimination owing to the shared racial characteristic. For example, if local officials deny permits to all 200 Chinese applicants for licenses to operate laundries in wooden buildings, while granting permits to all but one out of 80 Caucasian applicants, it raises the presumption of an equal protection violation. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). Similarly, if 100 people are arrested at a riot, a quarter of them from out-of-state, but of those prosecuted eighteen out of twenty are from out-of-state, it likewise raises the presumption of an equal protection violation. *See Armstrong*, 517 U.S. at 464-66. The sample size is large enough to raise a concern that the disfavored class was selected not because they were the most culpable, but because of their membership in the class. The government would properly bear the burden of demonstrating that the disparate treatment was a function of a legitimate government purpose.

Looking only at one individual, however, there is no way to know whether the difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive and largely subjective canvassing of all possible relevant factors. It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class. This consideration has been elegantly expressed by the

33

District of Massachusetts.  Responding to plaintiff's *Olech*-styled claim

challenging a zoning decision, the court held:

> It might be suggested that all applicants should be considered
> "similarly situated" simply because they had all made requests
> for waivers of the dead-end street length regulation. But that is
> so broad a definition of "similarly situated" that it is not useful
> for equal protection analysis; it could be applied to any group
> of applicants where, looking back, one could see that there had
> been some who succeeded and some who failed. For example,
> high school students whose applications to a particular college
> were rejected could allege that they were being treated
> differently from the "similarly situated" fellow students whose
> applications were accepted. In the example, *one would want to
> know a good deal more about the merits of individual
> applicants before deciding who was similarly situated to
> whom*.

*Lakeside Builders, Inc. v. Planning Bd. of the Town of Franklin,* 2002 WL

31655250, *3 (D. Mass. Mar. 21, 2002) (citations omitted; emphasis added).

Inevitably, the degree to which others are viewed as similarly situated

depends substantially on the facts and context of the case.  Plaintiffs will have an

easier time stating a claim where there are few variables in play and the set of

potentially similarly situated individuals is well-defined.  This is the key to

understanding *Olech*.  There, the village asked for a standard fifteen-foot

easement from everyone (other than the Olechs) who had requested a hookup to

the municipal water supply, without regard to differences in cost or circumstance.

When the village demanded a larger easement from the Olechs, with no apparent

legitimate reason for the difference, the Court was willing to recognize an equal

34

protection claim.

When multiple variables are in play, however, the difference in treatment can be the product of a number of considerations, conscious or otherwise, many of them legitimate. That is why the Supreme Court has imposed a substantially more "demanding" pleading burden on plaintiffs bringing claims of selective law enforcement. *Armstrong v. United States*, 517 U.S. 456, 463-64 (1995). Because the exercise of prosecutorial discretion implicates a host of variables from the relative culpability of the defendants to the optimal deployment of prosecutorial resources, it is correspondingly more difficult to bring an equal protection claim than in the classic case of discrimination against a suspect claim. *Id*. (describing the pleading requirement for selective prosecution equal protection claims as "a significant barrier to the litigation of insubstantial claims"); *see also Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1167-68 (10th Cir. 2003) (analogizing § 1983 equal protection claims to selective enforcement claims in the criminal context; relying on *Armstrong* to supply substantive standards). These burdens are occasioned by the multifarious nature of enforcement and prosecution decisions which touch on "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan[. These concerns] are not readily susceptible to the kind of analysis the courts are

35

competent to undertake." *Armstrong*, 517 U.S. at 465, *quoting Wayte v. United States*, 470 U.S. 598, 607 (1985).

Plaintiff contends that Detective Buzzard denied her equal protection when he failed to investigate the alleged rape with the same intensity and comprehensiveness as afforded to other rape victims. Further violations allegedly occurred when Detective Buzzard veered from his usual practice in asking Plaintiff to sign the waiver form. This raises what might be called a reverse-selective enforcement claim. While the typical claim is that law enforcement focused too many prosecutorial resources on a specific defendant, Plaintiff claims that too few resources were devoted to her case. But no matter which way the complaint is stated, the same policy considerations are implicated. In each case, the multiplicity of relevant (nondiscriminatory) variables requires plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently. *Armstrong*, 517 U.S. at 465-67.

For this reason, Plaintiff cannot overcome summary judgment. Nowhere in the over 550 pages of evidence submitted by Plaintiff to the district court does she supply *any* information regarding the allegedly similarly situated rape victims. What were the relative strengths of those cases? In how many was the victim's consent a central issue? Did other victims admit to being drunk? Did the rapes occur in a party setting? Did any other victim state that she would have trouble

identifying the perpetrators?  Were the other cases serial rapes where the victim admitted that she would have probably consented to sex with at least one of the suspects?  Did any of the other victims sign waiver forms?  Did any of them sign a second time, after being reinterviewed by a more supportive police officer?  Without answers to questions such as these, neither this Court nor a jury could meaningfully compare Plaintiff's treatment to that of other rape victims.  After all, as plaintiff, she bears the burden of proof on this issue after discovery. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, (1986).

We wish to emphasize that we in no way condone or excuse the failure of police to conduct an adequate investigation of such a crime.  The State of Oklahoma has enacted legislation designed to ensure that victims of rape, domestic violence, and sodomy receive a respectful hearing and have a right to request prosecution.  Primary responsibility for law enforcement rests with the city and the state.  Today, we hold only that the United States Constitution does not provide a cause of action on the legal theories invoked by the Plaintiff.

For the forgoing reasons, we **AFFIRM** the district court's grant of summary judgment to all defendants.