**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOBBY R. BRUNER,

      Plaintiff - Appellant,

v.

VERNON BAKER; JOHNNIE FORD;
MARY HANSON; KIM ASHLEY,

      Defendants - Appellees.

No. 04-6396

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-03-1308-HE)**

---

Submitted on the Briefs:

Carl Hughes, Kyle Goodwin and Jeb Joseph of Hughes & Goodwin, Oklahoma
City, Oklahoma, for Plaintiff - Appellant.

Wellon B. Poe, Assistant Attorney General, Oklahoma Attorney General
Litigation Section, Oklahoma City, Oklahoma, for Defendants - Appellees Hanson
and Ashley.

Stefan K. Doughty, Assistant Attorney General, Oklahoma Attorney General
Litigation Section, Oklahoma City, Oklahoma, for Defendants - Appellees Baker
and Ford.

---

Before **HENRY, ANDERSON** and **O'BRIEN**, Circuit Judges.

---

**O'Brien**, Circuit Judge.

---

Plaintiff Bobby Bruner was investigated by the Oklahoma Tax Commission (OTC) for tax fraud. The OTC filed criminal charges against Bruner which were voluntarily dismissed by the prosecuting attorney. Bruner filed this civil rights suit under 42 U.S.C. § 1983 against Vernon Baker and Johnnie Ford, investigators in the OTC's Special Tax Enforcement Unit, their supervisor Mary Hanson, and the OTC's assistant general counsel, Kim Ashley. The district court granted summary judgment in favor of all defendants. We exercise jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Bruner was the CFO for Healthback Holdings, LLC. He also performed consulting work for Healthback through Bruner Farms, Inc., of which he was president. Bruner had a joint bank account with Bruner Farms. Healthback's practice was to issue only one paycheck to Bruner for both his CFO salary and his consulting work. Healthback leased its staff from various employee leasing companies[1] including Fairway Employment Services, Inc. Fairway is partially owned by Bobby Bruner's son, Justin. As part of its contract with Healthback,

---

[1] An "employee leasing company," also referred to as a Professional Employer Organization (PEO), is a comprehensive offsite Human Relations Department. A PEO is responsible for payroll, labor law compliance, payroll taxes, employee benefits and other human resource functions.

Fairway gave its leased employees lump sum reimbursement payments in advance of the employees actually incurring expenses. This money was not reflected on the employees' W-2s or any other IRS form (*i.e.*, a 1099 form for independent contractors) and Fairway did not withhold taxes from the payments. Rather, the employees were responsible for either reporting the payments as income, if they did not actually incur expenses, or accounting for it as expense reimbursement if they did. As CFO of Healthback, Bobby Bruner was involved in the implementation of the "prepay" reimbursement program.

Baker, a lead investigator with the OTC, and Ford, an investigator-in-training, discovered payroll discrepancies while investigating Fairway. Of primary concern was Fairway's lack of withholding from the "prepay" reimbursement payments. In the process, Baker and Ford discovered what appeared to be Bruner's failure to report a large portion of his income on his tax returns. Baker and Ford advised their supervisor, Mary Hanson, of this fact and a case was opened and assigned to Baker. Eventually Baker prepared a "case lead sheet" recommending a criminal investigation. The case lead sheet was reviewed by an OTC lead review committee[2] and a criminal investigation was initiated.

During the investigation, Baker and Ford met with Bruner one time. During that meeting, Baker informed Bruner the OTC had objections to the

---

[2] The lead review committee consisted of Mary Hanson (Unit Coordinator for the Audit Division), Doug Allen (General Counsel), David Isley (Deputy Director of the Audit Division) and Larry Shropshire (Director of OTC).

"prepaid" expense reimbursement program and that they believed Bruner had not reported all of his income. Bruner replied he had reported all of his income. As a result of that meeting, Bruner retained a CPA, Patrick Walters, to represent him before the OTC. Bruner gave Walters all of his personal financial information, as well as that of Bruner Farms. Walters examined the information and discovered that several allowances paid to Bruner were in fact for Bruner Farms and was reported as income for Bruner Farms on its income tax returns. Walters prepared a letter, dated January 29, 2003, stating Bruner's income was properly reported and included Bruner Farms' employer identification number and copies of its income tax returns for 1999, 2000, and 2001. Walters did not provide any supporting documentation, such as an itemization of Bruner Farm's various sources of income, but offered to provide additional information if requested to do so in writing. OTC did not request further documentation.

Shortly after sending the letter, Walters met with Baker and Ford at Walters' office. Baker asked Walters to provide proof he was allowed to discuss the tax matters of Bruner Farms, such as a power of attorney or other written authorization. After the meeting, Baker gave Walters' letter and the Bruner Farms tax returns, which were unsigned, to Hanson and Ashley.[3] Hanson and

---

[3] In his deposition, Baker states the Bruner Farms tax returns were unsigned, and therefore he could not "testify to their veracity." (R. Vol. I at 346.) Bruner does not assert the Bruner Farms tax returns provided to Baker by Walters were, in fact, signed.

Ashley determined the unsigned returns were not germane to the investigation, and Baker generated a Final Report recommending prosecution. The Final Report was approved by the lead review committee and forwarded to the district attorney's office. The OTC did not provide the district attorney's office with Walters' letter or the Bruner Farms tax returns. The district attorney filed tax evasion charges against Bruner in state court. Subsequently, Bruner's attorney provided Rick Bozarth, the assistant district attorney in charge of the case, with Bruner Farms' tax returns and supporting documentation. Bozarth dismissed the criminal charges because of the unlikelihood of success in light of the income having been reported on Bruner Farms' income tax returns.

On September 12, 2003, Bruner filed this civil rights action alleging violations of his constitutional rights, as well as several state tort claims under the district court's ancillary jurisdiction,[4] and sought monetary damages. Bruner filed an amended complaint on April 6, 2004, specifically alleging violations of his First, Fourth and Fourteenth Amendment rights. On April 27, 2004, Baker and Ford filed answers to the amended complaint. On May 14, 2004, Hanson and Ashley filed separate motions to dismiss. On June 23, 2004, the district court granted those motions in part by dismissing Hanson and Ashley in their official capacities but retaining the complaint as to Hanson and Ashley as individuals. On

_____

[4] The state law tort claims were claims for slander and false light invasion of privacy.

July 7, 2004, Hanson and Ashley filed their answer to the amended complaint. On September 27, 2004, the defendants all filed motions for summary judgment. Bruner filed a response on October 15, 2004, which he amended on October 27, 2004. On November 1, 2004, the defendants filed reply briefs. Bruner argued to the district court that the reply briefs raised new issues and, on November 3, 2004, filed a motion for leave to respond. On November 8, 2004, the district court granted Bruner's request for leave to respond, but limited the response to three pages. Bruner filed the limited response on November 8, 2004.

On November 22, 2004, the district court issued an order granting summary judgment to the defendants and dismissing Bruner's pendant state law tort claims. The order stated a subsequent order would explain the basis for the grant of summary judgment. On December 17, 2004, Bruner filed a notice of appeal. That same day the district court issued the follow-up order explaining the basis for summary judgment. On December 23, 2004, Bruner filed an amended notice of appeal incorporating the December 17 order.

## II. DISCUSSION

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. "Conclusory allegations, however, do not establish an issue of fact under Rule 56." *Baker v. Penn Mut. Life Ins. Co.*, 788 F.2d 650, 653 (10th Cir. 1986).[5]

---

[5] As an initial matter, we pass lightly over the fifteen pages or so of Bruner's brief implying the district court dismissed this case simply to lighten its case load. Relying primarily on law review articles, especially Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982 (2003), and the raw number of cases Judge Heaton has dismissed on motions for summary judgment, Bruner states that orders granting summary judgment too frequently dispose of meritorious claims, especially civil rights actions, solely to lighten district court dockets. Bruner suggests that Judge Heaton is particularly susceptible to the pressure of a case load because he is a "relatively new district judge." (Appellant's Br. at 30; Reply Br. at 4-6.) Bruner cites the number of cases in which Judge Heaton has granted summary judgment, and states:

> [The statistics are] offered merely as an indication that the pressures about which Professor Miller wrote so eloquently may be impacting upon a relatively new district judge. The only issue of these statistics is that it should raise a red flag that the findings by the district court substituted his own feelings about the case for matters which should have been determined by the jury.

(Reply Br. at 5-6.) Bruner also states:

> In urging that Judge Heaton has fallen victim to the effects of a desire to address a sizeable case load, the undersigned means no disrespect to this jurist. Rather, . . . it is critical that the Tenth Circuit uses the facts of this case to send a clear message to the lower courts that they must carefully resist the temptation to use summary judgment motions as a means to lighten their case load.                    (continued . . .)

In order to state a § 1983 claim, a plaintiff must "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983 claims against public officials must demonstrate some form of personal involvement on the part of the

_____

(continued . . .)

(Appellant's Br. at 37.) We decline his invitation to do so.

Bruner's claim makes at least two assumptions: 1) that the number of meritorious civil rights claims filed in federal court outnumber the unmeritorious claims filed, and 2) that otherwise meritorious claims are somehow exempt from the Federal Rules of Civil Procedure. His first assumption is not supported by empirical evidence — in fact, it is difficult to imagine how it could be. However, even if we assume that Bruner could somehow establish the relative number of meritorious civil rights claims filed in federal court, general trends say nothing about the merits of a particular case. Even if 99 % of civil rights claims were meritorious and satisfied the Federal Rules of Civil Procedure, that fact says nothing about whether *this particular case* is meritorious.

Bruner's second assumption runs contrary to the policy and precedent behind the Federal Rules of Civil Procedure. Rule 56(c) exists to resolve cases where there is failure to establish an essential element. *See Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) *mandates* the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.") (emphasis added). *See also*, *Catrett v. Johns-Mansville Sales Corp.*, 756 F.2d 181, 187-91 (D.C. Cir. 1985) (Bork, J., dissenting) (discussing the function and policy of Rule 56(c)), *rev'd sub nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The denial of a meritorious motion for summary judgment is no less error than the grant of an unworthy one.

Bruner may certainly challenge the accuracy of Judge Heaton's application of the law, but accusations that a judge either consciously dismisses a specific case to lighten his caseload or passively and subconsciously "falls victim to the effects of desire to address a sizeable case load," teeters on the edge of permissible argument. Zealous advocacy permits hard blows, not foul ones. *See Berger v. United States*, 295 U.S. 78, 88 (1935).

individual defendants. *Coleman v. Turpen*, 697 F.2d 1341, 1346 n.7 (10th Cir. 1982). The plaintiff must show the defendants "caused" the constitutional deprivation. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990). This causal connection is shown if the defendants "set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights." *Id*. (*quoting Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988)). A supervisor can also be held liable if the supervisor expressly "authorized, supervised, or participated in conduct which caused the constitutional deprivation." *Id*.

## A. Fourth Amendment

"[A]n arrest is valid and does not violate the Fourth Amendment if the warrant underlying it was supported by probable cause at the time of its issuance; this holds true even if later events establish that the target of the warrant should not have been arrested." *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 114 (10th Cir. 1994) (White, J. (Ret.)). "Probable cause for an arrest warrant is established by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (citing FED. R. CRIM. P. 4; *Wong Sun v. United States*, 371 U.S. 471, 481 n.9 (1963)).

Arrest warrant affiants violate the Fourth Amendment when they "knowingly . . ., or with reckless disregard for the truth," include false statements

in the affidavit, *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978), or "knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause." *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990). "In a case involving information omitted from an affidavit, the existence of probable cause is determined 'by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.'" *Wolford*, 78 F.3d at 489 (*quoting Stewart,* 915 F.2d at 582, n.13). In some cases, "[r]ecklessness may be inferred from omission of facts which are clearly critical to a finding of probable cause." *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990) (internal quotations omitted). However, "[a]llegations of negligence or innocent mistake are insufficient." *Franks*, 438 U.S. at 171.

Primarily at issue here is the decision to not include the unsigned tax returns and Walters' letter with the affidavit in support of probable cause. After reviewing the record, we conclude the inclusion of the tax returns and Walters' letter would not have vitiated probable cause. The evidence reasonably suggested Bruner was not reporting all of his income. His personal tax returns did not report all of his known income. Bruner's tax statements were unusual in light of his joint paycheck for his CFO and consulting services. Moreover, Bruner's son managed the company with whom Healthback had contracts. In fact, Bruner conceded someone investigating his tax returns "might want to ask some more

questions and should have." (R. Vol. I. at 314.)

The inclusion of unsigned tax returns would not undermine this evidence. Unsigned tax returns are usually not valid because the signor has not attested, under penalty of perjury, that the returns are accurate. *See Olpin v. C.I.R.*, 270 F.3d 1297, 1300-01 (10th Cir. 2001); 26 U.S.C. §§ 6061, 6065. Walters' letter explaining the reasons for the income discrepancy on Bruner's personal tax return did not vitiate probable cause because Walters failed, upon request, to document his authority to discuss Bruner Farm's tax returns or Bruner's personal tax matters. Nor did Walters provide any of the supporting documentation to Baker and Ford that was necessary to identify the source of Bruner Farms' income, which was later provided only to the prosecuting attorney. Additionally, Bruner's expert witness, Nelson Bonnifield, conceded Bruner did not report the disputed income on his individual return and it was not apparent on the face of the Bruner Farms tax returns that the disputed income was claimed thereon. Thus, even if the returns were binding, and Walters was an authorized representative, the evidence presented to Baker and Ford by Walters did not clearly establish the disputed income was reported on the Bruner Farms tax returns.

Even were we to determine that the unsigned tax returns and Walters' letter would have vitiated probable cause, we agree with the district court's determination that none of the defendants' conduct rose to the level of recklessness. At worst, this case is similar to *Beard*, where Justice White

-11-

declared:

> [W]hile in hindsight it is beyond cavil that [the investigating officer] made a mistake in his representations to [the expert witness], and while the mistake may have had an impact in the outcome of [the expert witness'] analysis and the warrant application hearing, neither of these points bears much relevance to our inquiry. Under the Fourth Amendment our inquiry is focused neither on the existence nor the consequence of [the investigating officer's] error but on the intention behind it.

24 F.3d at 116. There is no evidence Baker intended to omit exculpatory evidence in order to falsely obtain a warrant. The other defendants' actions flowed from Baker's decision. *See DeLoach*, 922 F.2d at 621 (noting investigating officer is primarily responsible for deliberate exclusion of exculpatory information even when there are intervening actors). Ford, as Baker's junior partner, acquiesced in Baker's decision; Hanson, as Baker's supervisor, approved of it; and Ashley, as general counsel, reviewed it. Baker's actions, and therefore the other defendants' actions, do not rise to the level of reckless disregard for the truth. Nor is this a case where the excluded evidence is so compelling that its mere omission constitutes sufficient evidence of recklessness. *Id*. at 622 (requiring omitted evidence to be "clearly critical"); *Beard*, 24 F.3d at 116 (case presented "no obvious basis on which to build a case of recklessness by inference.").

Bruner argues *DeLoach* requires a jury to decide whether excluded evidence would have impacted the probable cause determination. 922 F.2d at 623 ("[I]t is a

-12-

jury question in a civil rights suit whether an officer had probable cause to arrest . .

. . This rule applies also to cases in which the officers made the misrepresentations

in an application for an arrest warrant."). Bruner's reading of *DeLoach* would

mandate that any time a plaintiff raises a Fourth Amendment claim under § 1983

and alleges exculpatory evidence was omitted, a jury must decide whether the

omission would have vitiated probable cause.

However, that is not the holding of *DeLoach*, nor have we followed such a

practice. Rather, *DeLoach* addressed whether the district court erred by not

granting the defendant a motion for judgment notwithstanding the verdict. 922

F.2d at 619. In the process of affirming the jury's award of damages to the

plaintiff, we held the district court was justified in submitting the question of

probable cause to the jury. *Id*. at 620, 623. In that context, we held the question

whether an officer had probable cause for an arrest was "a proper issue for the jury

if there is room for a difference of opinion." *Id*. at 623 (*quoting Llaguno v.

Mingey*, 763 F.2d 1560, 1565 (7th Cir. 1985)). Thus, *DeLoach*'s holding is not

intended to foreclose summary judgment in Fourth Amendment cases where there

"is no genuine issue of material fact" that the officers were not guilty of deliberate

falsehood or reckless disregard for the truth.[6] Rather, *DeLoach* simply points out

---

[6] After *DeLoach*, we affirmed the district court's grant of summary
judgment to the defendant in a case involving the withholding of exculpatory
handwriting samples. In *Beard*, we approved the district court's determination
that the effect of excluded evidence on probable cause warranted summary

(continued . . .)

-13-

that where there is a question of fact or "room for a difference of opinion" about the existence of probable cause, it is a proper question for a jury, even though it is normally determined by a court during the warrant application process. *DeLoach*, 922 F.2d at 623. Thus, Bruner's Fourth Amendment claim fails.

## B. Equal Protection

Bruner does not claim to be part of an identifiable suspect class that was categorically discriminated against. Rather, he alleges a "class of one" equal protection claim, as recognized by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."). Bruner claims the OTC violated his equal protection rights by singling him out for investigation and prosecution.

In *Jennings v. City of Stillwater*, we affirmed summary judgment in favor of the defendants on Jennings' claim that the defendant police officer's treatment of

_____

(continued . . .)

judgment for the defendant. 24 F.3d at 115-16. Additionally, in the context of the parallel issue of whether the removal of false evidence would have impacted the probable cause determination, we have examined the issue and upheld the district court's grant of summary judgment. *See Wolford*, 78 F.3d at 489 ("[T]he false and embellished testimony provided by [the defendant] to the grand jury was not material to the grand jury's probable cause determination.").

-14-

her case violated the Equal Protection Clause. 383 F.3d 1199, 1209 (10th Cir. 2004). Our decision rested on two grounds – first, we found Jennings "failed to identify any specific actions of the defendants that were both wholly arbitrary and lacking in legitimate justification and also had a concrete effect on her rights." *Id.* at 1212. Second, Jennings "failed to make an adequate showing that similarly situated persons were treated differently." *Id.* at 1213.

We noted "[t]his element is especially important in class-of-one cases," *id.*, emphasizing that "the multiplicity of relevant (nondiscriminatory) variables requires plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently." *Id.* at 1215 (citation omitted). *See also Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1149 (10th Cir. 2001) ("As with any equal protection claim," a plaintiff asserting a class-of-one equal protection claim "must . . . demonstrate that he was treated 'differently than another who is similarly situated.'") (*quoting Buckley Constr., Inc. v. Shawnee Civic & Cultural Dev. Auth.*, 933 F.2d 853, 859 (10th Cir. 1991) (additional citations omitted).

Bruner's equal protection claim fails because he has not made this necessary showing. Unlike in *MIMICS, Inc. v. Wildgrube*, 394 F.3d 836, 849 (10th Cir. 2005), where the plaintiffs provided evidence that businesses similarly situated to MIMICS were treated differently, and provided a chart demonstrating the differential treatment, Bruner provided no evidence of similarly situated individuals being treated differently.

On the contrary, Bruner conceded that someone investigating his tax returns "might want to ask some more questions and should have." (R. Vol. 1 at 314.) According to the district court, "Bruner, along with both his experts, Walter[s] and Bonifield, admitted that a comparison of his paychecks and personal tax returns would have raised a flag warranting further investigation." (*Id*. at 134.) Moreover, Bruner is in a unique position, defying easy comparison with other employees, on account of his position as CFO of Healthback, and Healthback's business relationship with his son's professional employee organization. Because Bruner has failed to point to any similarly situated individuals, let alone similarly situated individuals treated differently, his class-of-one equal protection claim must fail.

## C. First Amendment

Bruner claims the OTC investigated him for tax evasion because he was "identified as a critical witness in the investigation of his son's company," Fairway. (R. Vol. II at 612.) He further alleges the defendants violated their own regulations, discarded exculpatory evidence and publically branded him as a criminal because of "animus toward him as a witness." (*Id*. at 612-13.) Bruner alleges this conduct constitutes retaliation against him for participation in the reimbursement program and chills his exercise of his First Amendment rights.

"Generally speaking, government action which chills constitutionally protected speech or expression contravenes the First Amendment." *Wolford*, 78 F.3d at 488. "[W]hen the plaintiff alleges that the defendant's action was taken in

retaliation for protected speech, our standard for evaluating that chilling effect on speech is objective, rather than subjective." *Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004). "The harm must be of the type that would chill a person of ordinary firmness from continuing to engage in the protected speech." *Id.* "In the context of a government prosecution, a decision to prosecute which is motivated by a desire to discourage protected speech or expression violates the First Amendment and is actionable under § 1983." *Wolford*, 78 F.3d at 488.[7] "[T]he ultimate inquiry is whether as a practical matter there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for the hostility or punitive animus towards the [plaintiff] because he exercised his specific legal rights." *Gehl Group v. Koby,* 63 F.3d 1528, 1534 n.6 (10th Cir. 1995) (quotations omitted), *implicitly overruled on other grounds by Currier v. Doran*, 242 F.3d 905, 916 (10th Cir. 2001); *see also*, *Wolford*, 78 F.3d at 488 ("[T]he Seventh Circuit has held that the plaintiff in such an action carries the burden of establishing 'that the substantial or motivating factor [in the prosecution] was retaliation.'") (*quoting Rakovich v.*

---

[7] We assume, without deciding, that participation in a reimbursement plan is protected speech, even though structuring and implementing prepaid reimbursement programs for a private company is not actual speech or "conduct commonly associated with expression." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 760-61 (1988); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006) ("[W]e have extended First Amendment protection only to conduct that is inherently expressive."). We also assume the OTC's investigation qualifies as retaliatory prosecution. It is not at all clear, however, that OTC's investigation and recommendation of prosecution is the same as the prosecution itself for First Amendment purposes.

*Wade,* 850 F.2d 1180, 1189 (7th Cir. 1988)).

Bruner's claim that the OTC retaliated against him because of his possible role as a witness in the ongoing investigation and potential prosecution of his son for tax evasion was not presented in Bruner's initial or amended complaint.[8] Bruner first raised this "witness intimidation" version of his retaliation claim in his Response Brief to Defendants' Motion for Summary judgment filed on October 27, 2004. (R. Vol. I at 135, 138 n.12.) Bruner's failure to raise this argument in either complaint allows the district court discretion to ignore the argument. *See Baker,* 788 F.2d at 656 (holding district court had discretion to exclude plaintiff's new argument made for first time orally in response to defendant's motion for summary judgment.); *but see, Viernow v. Euripides Development Corp.*, 157 F.3d 785, 797 n.26 (10th Cir. 1998) (New allegation raised in plaintiff's response to defendant's motion for summary judgment may be treated as a request to amend under Rule 15. The request may be deemed granted where the district court permitted argument on the issue and addressed the issue in its ruling.) Unlike the district court in *Viernow*, the district court in this case did not specifically allow argument on the

---

[8] Bruner did raise a different First Amendment claim in his complaint. That is why the district court rejected the defendant's argument that he failed to raise a First Amendment claim and cited Bruner's initial complaint alleging Baker and Ford had "retaliated against [him] for various reasons, including, *inter alia*, Plaintiff had participated in implementing a plan." (R. Vol. I at 135 n.9, 138 n.12.) However, the initial claim had nothing to do with Bruner's role as a witness in the possible trial of his son, but rather was related to his own role in implementing the plan.

issue, nor does its discussion of the issue imply the grant of a motion to amend. This is especially true because it noted Bruner's failure to raise the "witness intimidation" argument as an alternative basis for rejecting Bruner's First Amendment claim. (R. Vol. I at 138 n.12.)

Even assuming Bruner's "witness intimidation" argument was allowed, there is no claim or evidence the OTC's conduct objectively chilled Bruner's speech. Bruner was not actually dissuaded from testifying, nor has he even had the opportunity to do so. The most he can muster is a general claim he was retaliated against for "providing evidence in a tax investigation," but he provides no details as to the information given, to whom it was given, or in what context. (Reply Br. at 10.) Bruner acknowledges "the record on this claim [is] limited at best," but blames that fact on "the district court's failure to allow sufficient opportunity to respond." (*Id*. at 10, n.2.) Charitably regarded, Bruner is claiming the OTC anticipatorily retaliated against him because of his possible role as a witness in the investigation or potential prosecution of his son. However, he has no evidence linking the OTC's decision to investigate him with his role as a potential witness or his provision of evidence supporting the prepaid reimbursement plan.[9]

Finally, Bruner provides no evidence of actual animus toward him by the

_____

[9] Bruner claims the defendants admitted he "was investigated and prosecuted for having presented evidence supporting the tax plan in question." (Reply Br. at 11.) However, Bruner does not point to any such admission in the record.

defendants. Bruner elicits three pieces of evidence to establish animus: (1) the failure to follow OTC regulations by not interviewing him prior to filing a criminal investigation, (2) the selective examination of his tax returns, and (3) the failure of the investigators to provide the prosecuting attorney with Walters' letter or Bruner Farms' tax returns.

Upon close inspection, these three pieces of evidence wither. First, the regulations allegedly violated apply not to investigators but to auditors. Second, as noted above, Bruner conceded someone investigating his tax returns "might want to ask some more questions and should have." (R. Vol. I at 314.) Thus, Bruner's complaints that he was unfairly singled out have little weight. Finally, as discussed previously, the failure of the investigators to turn over the unsigned tax returns for Bruner Farms and the letter written by Walters (who could not produce written authorization to discuss the relevant tax matters) was, at worst, negligent. These pieces of evidence taken together do not rise to the level of animus, let alone establish animus as the motivating reason for the investigation and prosecution. Thus, Bruner has failed to establish a violation of his First Amendment rights.

The decision of the district court granting summary judgment in favor of the defendants is **AFFIRMED**.