**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 11, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

AMERICAN FIRE AND CASUALTY
COMPANY; OHIO CASUALTY
INSURANCE COMPANY,

      Plaintiffs/Counter-Defendants,

v.

BCORP CANTERBURY AT
RIVERWALK, LLC, as Nominee;
BCORP HOLDINGS COLORADO,
INC.; BCORP MANAGEMENT, INC.;
KELLY BEGG; GARY BEGG; BCORP
ARLINGTON, LLC,

      Defendants/Counter-Claimants,

v.

ADMIRAL INSURANCE COMPANY,

      Defendant/Cross-Claimant-
      Appellee,

and

NORTH RIVER INSURANCE
COMPANY,

      Defendant/Cross-Claimant,

v.

No. 07-1174

(D.C. No. 04-CV-00197-EWN-BNB)
(D. Colo.)

ANDREW GRAVES; MARIA ALFARAZ; JON HESS; MELINDA THOMAS; RYAN KNUTSEN; ROSEMARIE LUMETTA; DANA OVERBEY; DAVID SEDDON; KEVIN WILLIAMS; ROY RAY; BETTE WEBBINK; RITA CAMPBELL; ANNA GORETZKI; JOSEPH MICKEY; MARIANNE MICKEY; IRENE HARRIS; MARY HASKINS; WILLIAM HASKINS; ETHEL ZOELLER; RAY ZOGLO; RUTH ZOGLO; MARINA LEFKOWICZ; BCORP-HRT, LLC

      Defendants/Cross-Defendants,

and

DAVID HOSLER; CHRISTINE SUESS; DEBBIE EYTCHESON,

      Defendants/Cross-Defendants-Appellants.

---

**ORDER AND JUDGMENT**[*]

---

Before **McCONNELL, BALDOCK**, and **GORSUCH**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

This Colorado insurance coverage dispute arises out of commercial general liability policies (Policies) Appellee Admiral Insurance Company (Admiral) issued to a condominium complex's builder and developers (collectively BCORP). The Policies obligated Admiral to indemnify BCORP for certain adverse judgments entered against the latter, including noneconomic damages for "bodily injury" occurring during the policy periods. Appellants Debbie Eytcheson, David Hosler, and Christine Suess (Homeowners) sued BCORP in Colorado state court for defective construction and repair of their condominium units, which Homeowners first occupied in September 2001, August 2000, and September 2000, respectively. Homeowners averred that BCORP's wrongdoing resulted in their units being inadequately soundproofed. At the state court trial, Homeowners evidenced that excessive noise levels caused them to experience sleep deprivation, physical exhaustion, anxiety, and other problems. A jury found BCORP liable and awarded Homeowners noneconomic damages of $150,000 each. Thereafter, BCORP declared bankruptcy and assigned its indemnity rights to Homeowners. To make a long story short, Admiral sought a declaratory judgment in federal court. See 28 U.S.C. §§ 1332, 2201. Admiral contended the Policies did not cover Homeowners' noneconomic damages awards. The district court granted Admiral's motion for summary judgment. See Am. Fire & Cas. Co. v. BCORP Canterbury at Riverwalk LLC, 506 F. Supp. 2d 418 (D. Colo. 2007). Homeowners appeal. We exercise jurisdiction under 28 U.S.C. § 1291, and vacate and remand.

3

I.

In their state court action, Homeowners averred BCORP's wrongdoing caused them continuous exposure to excessive noise levels from the time they occupied their residences. Homeowners alleged the harmful noise levels resulted from BCORP's failure to (1) install proper ceiling channels, (2) properly construct wall-stud connections between units, and (3) successfully repair the aforementioned deficiencies. Homeowners sought, among other remedies, economic and noneconomic damages. The parties do not dispute here that BCORP varied from architectural plans and specifications in building the condominium complex, and that this faulty construction resulted in excessive sound transmission to and from adjoining condominium units. See, e.g., Appellant's App. 567 (hereinafter App.).

Homeowners testified in state court to the noise issues they experienced in their respective units and how the excessive sound levels affected them. For instance, Appellant Debbie Eytcheson testified to hearing a variety of loud, unusual noises inside her residence from the time she first occupied her unit. These noises included (1) tapping noises in the water pipes behind her bedroom wall; (2) toilet flushing and other bathroom noises emanating from adjoining units; (3) adjoining neighbors speaking at a normal decibel inside their units, as well as in the public hallway; (4) a neighbor's television and telephone; (5) her neighbor opening and closing a microwave oven and cupboards; (6) a microwave oven beeping, clothes washer emptying, and clothes dryer clunking, even with Eytcheson's own television and/or computer turned on; and (7) her upstairs neighbors vacuuming ("It actually sounds like it is sucking up the floor."), and walking around at all times of the day and night.

4

("[T]he best way I can describe it is like St. Bernards or . . . Great Danes prancing around on the floor."). See App. 727-36.

Eytcheson stated she was embarrassed that she and her neighbors could hear each other so distinctly in their respective homes. See, e.g., App. 729 ("I don't even use an electric toothbrush because I don't want to disturb anybody."). She testified the noise continually woke her up. The noise was occasionally so loud in her bedroom that she slept on her living room couch. See App. 732-33, 739. Eytcheson also testified that, though she had resorted to sleeping with her fan on to block out the noise, doing so made her anxious because she feared the fan would prevent her from hearing the fire alarm in the event of an emergency. See App. 736-38.[1] Eytcheson explained that she sued BCORP to get her "life

---

[1] Eytcheson described how the noise problems in her residence affected her:
I have found myself . . . [vacillating between] not sleeping at night to wanting to sleep all the time. That's not only because I am tired [but] because I don't want to deal with all of this. It is just working two jobs and just trying to live on my own. It is really stressful for me . . . . I found myself doing things I wouldn't normally do. I have never locked my keys in my car. I did it twice in a week. I get paranoid about things like leaving my curling iron plugged in. I find myself going back to check it two or three times just to make sure it is unplugged. And I found myself in a daze . . . I need to make a living so it is like I just put myself on go and do the things I have to do to make a living. I eat, sleep, and work and it seems like that's all I do. I have lost – this last week I lost my ATM card. A few months ago I lost my Discover card . . . . And my life hasn't been the same in the last three years . . . . I have found myself so anxious that I have been rude and obnoxious and demanding to the people that I work with and that's not who I am. I have been so embarrassed about how I have been acting . . . . During the last 4 years I probably gained 30 to 40 pounds and I have been emotional during everything that happens. I put food in my mouth to comfort me . . . .

(continued...)

5

back" and "be free from stress." See App. 756.

Appellant David Hosler also described experiencing high sound levels in his unit from the time he first occupied his residence. He testified to daily disturbances by adjoining neighbors' stereos, telephones, alarm clocks, voices, and snoring. Hosler stressed, however, that his neighbors were in no way unreasonably loud. See App. 782-84, 797. Hosler testified that his upstairs neighbor's mechanized bed was particularly disturbing because it vibrated the entire bedroom. See App. 782-83 ("[T]he noise that emanates from that bed. You can feel it in your chest, it is a vibration and it goes on for 20, 30 seconds at a time . . . . The same noise emanates every time it is used."). He noted "constantly" hearing loud footsteps from the unit above, as well as his neighbor's wheelchair, which he could hear "clearly." Hosler would hear a "thump" whenever the wheelchair moved from carpeting to a hard surface. See App. 783. He testified that the excessive noise issues in his condominium caused him to lose sleep. Hosler wore earplugs to sleep. He later moved his bed into his living room so that it was not directly underneath his upstairs neighbor's mechanized bed. He testified that having his bed in the middle of his living room was embarrassing. See App. 791-92. Eventually, Hosler moved out of his unit because he "was going crazy." See App. 793. Hosler asked the jury to award him damages for what he had "been through in living in this unit. It has been a nightmare." See App. 796.

Appellant Christine Suess reported experiencing noise problems very similar to those

---

[1](...continued)
App. 751-53.

6

that Appellants Eytcheson and Hosler described. Suess testified that the first night she spent in her unit she was awakened by the sound of rushing water, which "sounded like a water main had broken in the building," but in fact was "the sound of water coming [from] . . . another unit." See App. 902. Suess testified to hearing her neighbors' voices so distinctly inside her home that she believed they were actually standing in another room of her condominium. See App. 904. In fact, Suess' neighbors were in an adjoining unit and speaking at a normal volume. See id. Additionally, she testified to hearing telephones ringing, appliances humming, and a dragging noise emanating from the unit above her, which "sounded like [her neighbor] was dragging a dead cowboy with his boots on" across the floor. See App. 906. Like Hosler, Suess underscored that her neighbors were "very, very gracious and very quiet" people. See App. 907.

Suess also testified that the noise problems caused her to lose sleep and embarrassed her (*i.e.*, the fact her neighbors could hear her inside her own home). Further, Suess stated that she no longer entertained on account of the obtrusive noise levels. See, e.g., App. 908, 921, 927. Regarding the repairs BCORP undertook to address the noise issues, Suess admitted being "frustrated" by having to temporarily move out of her unit and to being "angry" and "feeling deceived" because repairs were necessary in the first place. See, e.g., App. 915, 921. Suess testified that in the summer 2002, during the period BCORP was repairing her unit and she was living in temporary housing, the air conditioning failed and it was very hot. See id.

7

II.

The two Policies at issue here covered the periods from January 31, 2001 to January

31, 2002, and from January 31, 2002 to January 31, 2003 (collectively, policy periods). The

Policies obligated Admiral to:

> pay those sums that the insured becomes legally obligated to pay as damages
> because of "bodily injury" . . . to which this insurance applies . . . .
>
> * * * *
>
> This insurance applies to "bodily injury" . . . only if: (1) [t]he "bodily injury"
> . . . [was] caused by an "occurrence[;]" and (2) [t]he "bodily injury" . . .
> occur[red] during the policy period.

See App. 981, 1034. The Policies defined "bodily injury" as "bodily injury, sickness or

disease sustained by a person, including death resulting from any of these at any time." See

App. 990, 1043. The Policies defined "occurrence" as "an accident, including continuous

or repeated exposure to the same general harmful conditions." See App. 992, 1045.

In support of its motion for summary judgment, Admiral asserted, among other things,

that the state court jury did not award Homeowners damages for "bodily injury" because

Homeowners presented inadequate evidence of physical manifestations of their emotional

distress.[2] See Nat'l Cas. Co. v. Great Sw. Ins., 833 P.2d 741, 746-47 (Colo. 1992) (holding

that the term "bodily injury," as used in an insurance policy, did not encompass "claims for

---

[2] At trial, the state court instructed the jury that in determining damages, it must consider "[a]ny noneconomic losses or injuries which each individual plaintiff has had to the present time or which each individual plaintiff will probably have in the future, including: mental pain and suffering, inconvenience, emotional distress, and impairment of the quality of life . . . ." See App. 629.

8

purely nonphysical or emotional harm"). In response, Homeowners argued they directly testified during trial to suffering "bodily injury," *i.e.*, sufficient physical manifestations of emotional distress, during the policy periods. To buttress their position, Homeowners submitted supplemental affidavits to the district court. The affidavits purported to "more fully" describe Homeowners' testimony at the state trial regarding the physical manifestations of their emotional distress. See App. 1153-58.

In its dispositive order, the district court first concluded that it could look beyond the state court trial record and consider Homeowners' affidavits in making its indemnification determination. See BCORP Canterbury, 506 F. Supp. 2d at 428-29. Second, the district court ruled that Homeowners' citation to a 130-page excerpt of their trial testimony was a "conclusory allegation," which was insufficient, as a matter of law, to demonstrate a genuine issue of material fact as to physical manifestations of emotional distress. See id. at 429-30. Finally, the district court concluded that, based on "a combination" of Homeowners' trial testimony and their affidavits, Homeowners failed to establish a genuine issue of material fact as to whether they had (1) suffered "bodily injury," (2) during the policy periods. See id. at 431-34. Because the court resolved the Homeowners' claims based on their lack of "bodily injury" during the policy periods, it declined to address whether Homeowners' injuries were the result of an "occurrence" within the meaning of the Policies. Neither did the court address Admiral's argument that the Policies' pre-existing damage exclusions barred Homeowners' indemnification claims.

9

III.

We review de novo a district court's grant of summary judgment, applying the same legal standard as the district court under Fed. R. Civ. P. 56(c). See Yaffe Cos., Inc. v. Great Am. Ins. Co., 499 F.3d 1182, 1184-85 (10th Cir. 2007). "We review a district court's evidentiary rulings at the summary judgment stage for abuse of discretion." See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006). While federal law controls whether the district court properly granted summary judgment, Colorado substantive law governs this case. See Clark v. State Farm Mut. Auto. Ins. Co., 319 F.3d 1234, 1240 (10th Cir. 2003) (federal court sitting in diversity must apply the substantive law of the forum state). Our review of the district court's determination of Colorado law is de novo. Therein, we "apply the most recent statement of Colorado law by the Colorado Supreme Court." Blackhawk-Cent. City Sanitation Dist. v. Am. Guar. & Liab. Ins. Co., 214 F.3d 1183, 1188 (10th Cir. 2000); see also Woolard v. JLG Indus., Inc., 210 F.3d 1158, 1168 (10th Cir. 2000) ("A federal district court's state-law determinations are entitled to no deference and are reviewed de novo."). "When the Colorado Supreme Court has not yet addressed an issue, we seek to predict how that court would decide the question." Blackhawk-Cent. City Sanitation Dist., 214 F.3d at 1188. Intermediate state court decisions, while not binding authority, may prove helpful in this endeavor. See Clark, 319 F.3d at 1240-41.

A.

We first address whether the district court properly considered Homeowners' affidavits in ruling on Admiral's motion for summary judgment. Cyprus Amax Minerals Co. v. Lexington Ins. Co., 74 P.3d 294, 299 (Colo. 2003) (en banc) ("We must begin by deciding what a court may review in resolving whether an insured is entitled to indemnification of its loss."). As explained above, in reaching its summary judgment ruling, the district court considered — over Admiral's objection — the Homeowners' supplemental affidavits. Admiral argues this constituted error because the affidavits were not presented to the state court jury and, thus, are irrelevant to whether the jury awarded Homeowners noneconomic damages for "bodily injury." Homeowners respond by noting that, under Colorado law, extrinsic evidence may aid a trial court's indemnity determination.[3] Clearly, under certain circumstances, a court may look beyond the underlying complaint and consider "extrinsic evidence" in making an indemnity determination. Id. at 301-02. "[I]f a broad reading of the complaint indicates that coverage may possibly attach, additional evidence supporting or defeating the existence of coverage, including the *factual record developed at trial and the ultimate judgment*, may be taken into account." McGowan v. State Farm Fire & Cas. Co.,

---

[3] Homeowners also argue that the district court could consider their affidavits because they were not required to establish "bodily injury" to recover against BCORP in state court. This argument is unavailing and misconstrues the nature of this matter. In this indemnification suit, Homeowners stand in BCORP's shoes as its assignees. BCORP was not, as a party defendant, required to prove *anything* in state court. Whether Admiral's duty to indemnify extends to the liability *actually imposed* on BCORP in state court is all that is at issue here.

11

100 P.3d 521, 524 (Colo. Ct. App. 2004) (emphasis added) (citing Cyprus Amax Minerals Co., 74 P.3d at 301). But what Homeowners fail to recognize is that, to be relevant to the indemnity question, the extrinsic evidence may only clarify or explain the evidence presented to the state court jury.[4]

Under Colorado law, "the duty to indemnify relates to the insurer's duty to satisfy a judgment entered against the insured" and "arises only when the policy actually covers the alleged harm" that formed the basis for the judgment entered. Cyprus Amax Minerals Co., 74 P.3d at 299, 301. The standard to determine if extrinsic evidence is admissible is therefore whether the evidence clarifies whether the judgment — "the actual liability imposed" — falls within the policy's coverage. Id. at 299. Extrinsic evidence is only relevant in this determination to the extent that it "assist[s] the trial court in determining whether and to what extent *actual liability*, as represented by a verdict or settlement, is covered by an existing policy." Id. at 301-02. An indemnity dispute is not an opportunity for plaintiffs to "retry the[ir] tort case." See Bohrer v. Church Mut. Ins. Co., 965 P.2d 1258, 1267 & n.9 (Colo. 1998) (en banc). Yet, by entertaining Homeowners' affidavits, which purported to "more fully" describe Homeowners' testimony at the state trial, see App. 1153-58, the district court effectively allowed Homeowners just such an opportunity. Cyprus

---

[4] In Cyprus Amax Minerals Co. the insured's indemnity claim against the insurer arose out of a settlement between a claimant and the insured. See Cyprus Amax Minerals Co., 74 P.2d at 297. Unlike the instant matter, a factual record arising out of an underlying trial and judgment was conspicuously absent in that case. As the court in that case recognized: "Where the claims do not proceed through the crucible of trial, and instead are settled by the parties, the analysis becomes more difficult." Id. at 301.

Amax Minerals Co., 74 P.3d at 300-02. In so doing, the district court contravened Colorado law. See Argo, 452 F.3d at 1199. We therefore must consider Admiral's summary judgment motion absent Homeowners' affidavits.

B.

The district court concluded that Homeowners' summary judgment response failed to demonstrate a genuine issue of material fact regarding whether they testified at trial to suffering "bodily injury" as a result of BCORP's defective soundproofing. Admiral's summary judgment motion averred, in its "Statement of Undisputed Material Facts," that Homeowners had not testified to suffering any "bodily injury." See App. 570-572. In Homeowners' response, under the heading "Response to [Admiral's] Statement of Undisputed Material Facts," Homeowners denied Admiral's factual allegation, by citing generally to 130 pages of their direct trial testimony. See App. 1102-04. Deeming Homeowners' denial a "conclusory allegation," the district court ruled that Homeowners' direct testimony could not, as a matter of law, forestall Admiral's summary judgment motion. See BCORP Canterbury, 506 F. Supp. 2d at 430 & n.5. On appeal, Homeowners insist their summary judgment response provided specific record citations and, thus, the district court erred in disregarding their trial testimony. See App. 1110-14. We agree.

Contrary to the district court's assertion that Homeowners "baldly insist[ed]" they each testified to "bodily injury" without proper evidentiary support, see BCORP Canterbury, 506 F. Supp. 2d at 430, Homeowners' response included pinpoint record citations. After

13

responding to Admiral's "undisputed" material facts, the next section of Homeowners' brief set forth — under the heading "Additional Statement of Undisputed Facts" — their own "undisputed" material facts. Therein, Homeowners summarized portions of their respective trial testimony pertinent to the "bodily injury" analysis, and provided record citations thereto. See App. at 1110-12. To be sure, general citations to vast portions of a voluminous record are likely to constitute "conclusory allegations," which "do not establish an issue of fact under Rule 56." See Bruner v. Baker, 506 F.3d 1021, 1025 (10th Cir. 2007). But Fed. R. Civ. P. 56(c) does not insist that a party set forth their factual allegations in a particular section of a brief. Parties may reasonably expect the district court to read their motion papers, provided they otherwise comport with local rules, in their entirety. Accordingly, we conclude the district court abused its discretion in finding Homeowners only supported their position regarding "bodily injury" with conclusory allegations. See Argo, 452 F.3d at 1199.

## C.

What remains is the seminal question of whether a genuine issue of material fact exists regarding Admiral's duty, under the terms of the Policies, to indemnify Homeowners, as BCORP's assignees. Yet we are loath to answer this question in the first instance given the district court's improper view of the record and the unsettled state of Colorado law. In reaching the merits, the district court purported to assess whether "a combination of [Homeowners'] trial testimony and extrinsic evidence in the form of affidavits" established a genuine issue of material fact on the issue of "bodily injury." BCORP Canterbury, 506 F.

14

Supp. 2d at 430. But, as we explained, the district court (1) improperly considered Homeowners' affidavits, and (2) likely failed to consider the state trial court record in its entirety.

As an example of the latter, the district court did not cite the trial transcript in summarily concluding that Homeowners failed to establish their injuries occurred during the policy periods. See, e.g., id. at 433 ("As with the other Homeowners, Ms. Eytcheson's allegations are insufficient to establish a genuine issue of material fact that she suffered 'bodily injury' during the effective period of the Policies."). Yet the first Policy became effective on January 31, 2001 and the second on January 31, 2002. Coverage ended a year later. In its opening brief, Admiral acknowledges that the condominium association, of which Homeowners were members, formed a committee to complain of the noise problem in August 2001, during the effective policy periods. See Appellee's Br. at 3. Admiral further acknowledges that BCORP attempted to remedy the noise problem in 2002 at a time when Homeowner occupied their dwellings. See id. One might reasonably infer that Homeowners suffered injury during the policy periods. See Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1195 (10th Cir. 2008) (explaining that under Rule 56(c), we view the facts and reasonable inferences to be drawn therefrom in favor of non-movant). The district court's cursory treatment of the policy periods issue troubles us given the fact-driven nature of indemnification claims. See Cyprus Amax Minerals Co., 74 P.3d at 301 ("[W]hether [indemnification] coverage is ultimately required is a question of fact.").

15

We are also hesitant to reach the merits in the first instance because this case appears to present a novel issue of Colorado law regarding Homeowners' claim of "bodily injury." Under Colorado law, emotional distress may constitute "bodily injury." Nat'l Cas. Co., 833 P.2d at 746. Recovery for "bodily injury" arising from emotional distress, however, is limited. Namely, in Colorado an insured must establish "physical manifestations" of their emotional distress. Id. But, aside from clarifying that claims for "*purely* nonphysical or emotional harm" do not trigger "bodily injury" coverage, the Colorado Supreme Court has not spoken to what is required to meet the "physical manifestation" requirement. Id. (emphasis added).

The facts of this case fall in between existing Colorado precedents. In National Casualty Company — the only Colorado Supreme Court decision to date to address this issue — the plaintiff "did not allege *any* physical injury, physical contact, or pain." Id at 747. In contrast, Homeowners each testified that BCORP's defective soundproofing caused them a variety of physical ailments. Less clear is whether Homeowners' ailments are comparable to the "chronic," "long-continued," or "repeated" "nausea, headaches, hysterical attacks, or mental aberrations" the Colorado Court of Appeals has deemed sufficient to recover under Colorado law. See Parr v. Triple L&J, Corp., 107 P.3d 1104, 1108 (Colo. Ct. App. 2004); Colwell v. Mentzer Invs., Inc., 973 P.2d 631, 638 (Colo. Ct. App. 1998). Notably, however, the state appellate court has determined that a triable issue existed where a plaintiff testified that her emotional distress was accompanied by "nausea" and "ongoing nightmares." State Farm Fire & Cas. Co. v. Nikitow, 924 P.2d 1084, 1089 (Colo. Ct. App. 1995).

16

In <u>Nikitow</u>, the state appellate court held a genuine issue of material fact remained in a case involving an insurance dispute over whether a chiropractor's "bodily injury" policy covered a claim for emotional distress. <u>Id.</u> The plaintiff was rendered quadriplegic when an undiagnosed spinal tumor ruptured during a chiropractic treatment. <u>Id.</u> at 1086. After the injury, the defendant sent the plaintiff a marketing letter urging her to "return to his office for chiropractic care." <u>Id.</u> at 1088. The plaintiff sued the defendant chiropractor for malpractice and other negligence, including emotional distress related to the marketing letter. After the case was set for trial, the parties settled. The chiropractor's insurance carrier subsequently filed a declaratory judgment action, denying it owed coverage. Ultimately, the appellate court reversed entry of summary judgment in the insurer's favor. <u>Id.</u> at 1088-89. According to the court, the plaintiff's testimony that she had experienced "*physical discomfort associated with nausea that resulted from receipt of the letter* and also testified to ongoing *nightmares* that in effect produced physical discomfort" created a genuine issue of material fact concerning whether the claim amounted to one for "bodily injury." <u>Id.</u> at 1089 (emphasis added).

Whether the nature and severity of Homeowners' complaints are sufficient to constitute physical manifestations of emotional distress under Colorado law is a close question. <u>See</u>, <u>e.g.</u>, <u>Parr</u>, 107 P.3d at 1108; <u>see also</u> <u>Johnson v. Overright Trucking, Inc.</u>, No. A-04-CV-1070-PSF/PA, 2005 WL 1719738, at *3 (D. Colo. July 21, 2005) (applying Colorado law) (triable issue existed regarding emotional distress where plaintiffs alleged "defendants' actions caused them emotional distress resulting in insomnia, weight gain, and

17

muscle twitches").  Given the uncertain state of Colorado law, Homeowners' claims might

be sufficient to render summary judgment inappropriate on the question of whether they

suffered "bodily injury" within the meaning of the Policies.

We believe a remand is the proper course of action so the district court might consider

the question of "bodily injury" anew based on a proper review of the state trial court record

(absent Homeowners' supplemental affidavits), in light of existing Colorado law.  If

appropriate, the district court is free to consider certifying this matter to the Colorado

Supreme Court for guidance.  See Colo. App. R. 21.1.  At the same time, nothing in our

decision is intended to proscribe any other argument the parties might wish to raise in

support of their respective positions, including those related to the Policies' definition of

"occurrence" and the pre-existing damages exclusion.

VACATED and REMANDED.

Entered for the Court

Bobby R. Baldock
Circuit Judge